**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joel D. Smith (State Bar No. 244902)
Sean L. Litteral (State Bar No. 331985)
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com
        jsmith@bursor.com
        slitteral@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC BARNES and KATTY LOPEZ individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>IOVATE HEALTH SCIENCES U.S.A., INC.,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiffs Eric Barnes and Katty Lopez (hereafter "Plaintiffs"), individually and on behalf of all other similarly situated purchasers (hereafter the "Class"), bring this consumer class action against Iovate Health Sciences U.S.A., Inc. (hereafter "Defendant") for the distribution, advertisement, and sale of certain products, including (1) HydroxyCut Hardcore, (2) HydroxyCut Hardcore Elite, (3) HydroxyCut Ultra Lean, and (4) HydroxyCut Pro Clinical (collectively the "Products") in violation of Dietary Supplement Health and Education Act of 1994, Pub. L. No. 103-417, 108 Stat. 4325.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, and Plaintiff, as well as most members of the proposed class, are citizens of states different from Defendant. This Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

2. Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because Plaintiffs are citizens of California and reside in this District, and because Plaintiffs purchased the Products in this District. Moreover, Defendant purposefully availed itself of this District through its distribution, advertisement, and sale of the Products, which are the subject of the present complaint, in this District.

## THE PARTIES

3. Plaintiff Eric Barnes is an individual domiciled in Saratoga, California. Plaintiff Barnes purchased (1) HydroxyCut Hardcore and (2) HydroxyCut Hardcore Elite at numerous points during the last four years from a Walmart store in Santa Clara County for personal use in California. In doing so, Plaintiff Barnes relied upon Defendant's advertising, packaging, labeling and other promotional materials, which were jointly prepared and approved by Defendant and its agents and disseminated through advertising media containing the unlawful claims alleged herein. Plaintiff Barnes would not have purchased the Products if he had known that they were unlawful to sell under California law.

///

4. Plaintiff Katty Lopez is an individual domiciled in Antioch, California. Plaintiff Lopez purchased (1) HydroxyCut Ultra Lean and (2) HydroxyCut Pro Clinical at numerous points during the last four years from a Walmart store in Antioch for personal use in California. In doing so, Plaintiff Lopez relied upon Defendant's advertising, packaging, labeling and other promotional materials, which were jointly prepared and approved by Defendant and its agents and disseminated through advertising media containing the unlawful claims alleged herein. Plaintiff Lopez would not have purchased the Products if she had known that they were unlawful to sell under California law.

5. Defendant Iovate Health Sciences is a Delaware corporation with its principal place of business in Wilmington, Delaware. At times relevant to this Complaint, Defendant has advertised, marketed, and sold a variety of cosmetic products, including the Products at issue, to consumers throughout the United States and the State of California. Defendant has sold the Products directly to consumers via the Internet and through third-party retail stores throughout the United States, including in this District.

## FACTUAL ALLEGATIONS

### The Labelling Requirements for Dietary Supplements

6. In 2020, the dietary supplements market in the U.S. was estimated at $46 Billion, and the global market for dietary supplements is expected to grow to $298.5 Billion by 2027.[1]

7. For decades, consumers have been prioritizing their health and wellness through the use of dietary supplements. That interest took on even greater resonance when the COVID-19 pandemic struck last year, with millions of American consumers seeking out ways to stay healthy and boost their immunity.

8. According to leading market research firm IRI, spurred by the pandemic, the vitamin and supplement category has skyrocketed. IRI calculates that vitamin, mineral and supplement sales have risen 21% since the pandemic began, with market shares of certain types of

---

[1] https://www.businesswire.com/news/home/20210219005385/en/Global-Dietary-Supplements-Market-Report-2020-Market-to-Reach-298.5-Billion-by-2027---U.S.-Market-is-Estimated-at-46-Billion-While-China-is-Forecast-to-Grow-at-12.7-CAGR---ResearchAndMarkets.com.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    2

vitamins and supplements increasing exponentially. Crowe, Emily, Behind the growth in the dietary supplement, vitamin market. *Smart Brief* (March 3, 2021) (accessible at: https://www.smartbrief.com/original/2021/03/behind-growth-dietary-supplement-vitamin-market).

9. Larry Levin, executive vice president of consumer and shopper marketing at IRI states that: "Prior to COVID-19, 80% of consumers were using vitamins, minerals and supplements as part of their ritual anyway, but I think the pandemic just strengthened their commitment to the product category." *Id.*

10. IRI data shows that buying vitamins and supplements has been at the forefront of consumers' minds since the early days of the pandemic, with 35% of households buying vitamins in the four weeks ending April 5, 2020. *Id.* The momentum has continued, with 40.6 million households purchasing vitamins in January 2021, compared to 35.5 million the prior year. According to Mr. Levin, "When you think about the impact that category has on our lifestyle, it's really profound." *Id.*

11. The COVID-19 pandemic has demonstrated more than ever that consumers will seek to support their health through dietary supplements and, in making those critical purchasing decisions, must be able to trust that labels and claims for dietary supplements are truthful, substantiated, and meet all legal requirements to be lawfully sold over the counter.

12. The Federal Food, Drug, and Cosmetic Act of 1938, 21 U.S.C. § 301 *et seq*. (the "FFDCA" or the "Act"), as amended by the Dietary Supplement Health and Education Act of 1994, Pub. L. No. 103–417, 108 Stat. 4325 ("DSHEA"), as well as the regulations implementing the FFDCA and DSHEA set forth the legal requirements for labelling and selling dietary supplements. These requirements are fully incorporated into California's Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code § 109875 *et seq*. ("Sherman Law").

13. Under the FFDCA, a "drug" is defined, in part, as an "article[] intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals" or an "article[] (other than food) intended to affect the structure or any function of the body of man or other animals."

14. Under 21 U.S.C. §§ 331(d) and 355(a), the FDA must approve new drugs before

1  they can be sold on the market. The FFDCA creates an exemption from this pre-approval process for dietary supplements "intended to affect the structure or function of the body" if the dietary supplements carry a prominent FDA disclaimer on the product labels and advertising.

15. Under these regulations, supplement companies like Defendant are prohibited from labeling, marketing, or selling dietary supplements bearing claims that "describe[] the role of a nutrient or dietary ingredient intended to affect the structure or function in humans, [or that] characterize[] the documented mechanism by which a nutrient or dietary ingredient acts to maintain such structure or function" (known as "structure/function claims"), unless the label carries a prominent disclaimer (the "DSHEA Disclaimer") on each panel bearing such claims. *See* 21 U.S.C. §§ 321(g)(1), 331(d), 343(r)(1)(B), 343(r)(6), 355(a); 21 C.F.R. § 101.93(d) ("On product labels and in labeling (e.g., pamphlets, catalogs), the disclaimer shall appear on each panel or page where there [is a structure/function claim].").

16. The DSHEA Disclaimer must be prominent and bolded, and it must read:

> **These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure, or prevent any disease.**

21 U.S.C. § 343(r)(6)(C); *see also* 21 C.F.R. § 101.93(b)-(e).

17. As one Court recently explained, the DSHEA Disclaimer requirement is important for consumer safety:

> The disclaimer requirement aligns with the FDA's recognition that few dietary supplements have been the subjects of adequately designed clinical trials. Without the disclaimer, structure/function claims convey therapeutic drug claims, thereby encouraging self-treatment without the benefit of a medical diagnosis or treatment. The point of the disclaimers are to make sure that consumers understand that structure/function claims are not reviewed by [the] FDA prior to marketing, and to caution consumers that dietary supplements bearing such claims *are not for therapeutic uses*.

*Arora v. GNC Holdings, Inc.*, No. 19-cv-02414-LB, 2019 WL 6050750, at *3 (N.D. Cal. Nov. 15, 2019) (internal quotation marks and citations omitted) (emphasis in original).

18. Dietary supplements that do not bear the required DSHEA Disclaimer on **all** panels with structure/function claims, and/or the disclaimer lacks the prominence required, are misbranded and unlawful. 21 U.S.C. § 343(r)(1)(B), (r)(6); 21 C.F.R. § 101.93(d).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    4

19. Moreover, such products qualify as "drugs" under the FFDCA because they are marketed with structure/function claims but do not include the DSHEA Disclaimer. *See* 21 U.S.C. §§321(g)(1), 343(r)(6). To avoid being regulated as drugs under the FFDCA, dietary supplements bearing structure/function claims must comply with the DSHEA Disclaimer requirements. *Id*.

20. Misbranded dietary supplements and/or unapproved drugs are unlawful and cannot be sold legally under federal and identical California law. 21 U.S.C. §§ 331, 333.

**Defendant Iovate Health Sciences' Unlawful Advertising, Sale and Labeling of the Products**

21. Unfortunately for consumers, Defendant Iovate continues to advertise, sell, and label its products in violation of the statutes referred to herein.

22. At numerous points during the Class Period, Plaintiff Barnes purchased Defendant Iovate's HydroxyCut Hardcore and Hardcore Elite. As the photographs below demonstrate, Iovate's products do not comply with the laws and regulations set out herein.

23. Photographs of the relevant panel and structure / functions claims made as a part of the packaging for HydroxyCut Hardcore is set out below. HydroxyCut Hardcore's left-facing panel contains numerous structure or function claims. Iovate claims that "[w]hen you're looking for hardcore results, reach for the power of HydroxyCut Hardcore. *Formulated with a scientifically researched key weight loss complex (green coffee extract)*. HydroxyCut Hardcore has been designed to deliver the significant weight loss results you've been looking for." (emphasis added). Iovate also claims that green coffee extract is a "*Key Weight Loss Ingredient Tested in 2 Scientific Studies*." (emphasis added). In support of this statement, Iovate states that "[i]n one study, *subjects taking the primary ingredient (green coffee extract) . . . for 60 days lost, on average, 10.98 lbs versus the placebo group*." (emphasis added). Iovate then notes that "[i]n a separate 8-week study, *subjects using the same key ingredient lost an average of 3.7 lbs versus the subjects using a placebo*." (emphasis added). But Iovate does not stop there. Instead, Iovate goes onto claim that "HydroxyCut Hardcore *contains another powerful ingredient (caffeine anhydrous) that's been shown to deliver a serious boost of energy*. After your very first dose you'll experience extreme energy for maximum intensity." (emphasis added).

24. Each of these statements explicitly describe the role of the green coffee extract and

caffeine anhydrous ingredients and their role, namely weight loss and energy development, experienced by humans consuming these ingredients. Accordingly, these statements represent structure/function claims. However, as the photographs set out below demonstrate, these statements are not accompanied by the requisite DSHEA Disclaimer.



25.   Likewise, the left-facing panel of Iovate's HydroxyCut Hardcore Elite contains multiple controverted statements that violate the Dietary Supplement Health and Education Act of 1994. Iovate encourages consumers to "[f]uel your most intense workouts and tackle your jam-packed days *with a scientifically researched dose of caffeine anhydrous that boosts energy and mental focus*." (emphasis added). Iovate doubles down by noting that " *[i]n one study, researchers monitored subjects who took C. canephora robusta – the key weight loss ingredient*

*in HydroxyCut Hardcore Elite – for 60 days*. On average, they lost 10.95 lbs, while the placebo group lost an average of 5.4 lbs." (emphasis added). Iovate then advertises that "[i]n a separate 8-week study, researchers monitored two groups following a calorie-reduced diet and performing moderate exercise. *Subjects using C. canephora robusta lost an average of 3.7lbs, while those using a placebo lost an average of 1.25 lbs.*"

26. Again, these statements specifically describe the role of "key" ingredients, caffeine anhydrous and C. candephora robusta, to their role, namely weight loss and energy development, experienced by humans consuming these ingredients. Accordingly, these statements represent structure/function claims. However, as the photograph set out below demonstrates, these statements are not accompanied by the requisite DSHEA Disclaimer.



27. Iovate's failure to comply with the regulations set out above also affected Plaintiff Lopez's purchase of HydroxyCut Ultra Lean and HydroxyCut Pro Clinical. On one panel of HydroxyCut Ultra Lean, Defendant Iovate claims that ***"[t]he HydroxyCut research and development team have developed this unique synergistic ingredient combination for weight loss."*** (emphasis added). Iovate claims that ***"CurcumaSlim™ is a combination of two ingredients: pure turmeric / curcumin that provides 95% curcuminoids and alpha lipoic avid (ALA), a compound found naturally in the body that helps turn glucose into energy."*** (emphasis added). Iovate goes on to claim that ***"[t]wo scientific studies support the weight loss results from CurcumaSlim™."*** (emphasis added). Specifically, Iovate writes that ***"[i]n two 16-week studies, subjects using the key ingredient combination (alpha lipoic acid and curcumin) lost an average of 12.56lbs v. 6.12 lbs for placebo and 4.84 lbs v. 0.87 lbs for placebo, respectively."*** (emphasis added). A photograph of the panel bearing these statements are set out here:

> **AMERICA'S #1 SELLING**
> WEIGHT LOSS SUPPLEMENT BRAND
>
> **AN EXCLUSIVE, PATENTED WEIGHT LOSS DISCOVERY:**
> **CURCUMASLIM™**
> The Hydroxycut® research and development team have developed this unique, synergistic ingredient combination for weight loss, protected by two U.S. patents.▲
> Patent No. US 9,040,576 B1 and No. US 9,770,434 B2
>
> **INNOVATIVE INGREDIENT COMBINATION**
> CurcumaSlim™ is a combination of two ingredients: pure turmeric/curcumin that provides 95% curcuminoids and alpha lipoic acid (ALA), a compound found naturally in the body that helps turn glucose into energy.▲
>
> **WEIGHT LOSS BACKED BY SCIENCE**
> Two scientific studies support the weight loss results from CurcumaSlim™.▲,1
>
> **DOUBLE THE WEIGHT LOSS▲**
> 1In two 16-week studies, subjects using the key ingredient combination (alpha lipoic acid and curcumin) lost an average of 12.56 lbs. vs. 6.12 lbs. for placebo and 4.84 lbs. vs. 0.87 lbs. for placebo, respectively. All subjects followed a calorie-reduced diet and walking program.▲
>
> 12.56 lbs. LOST! — PATENTED CURCUMASLIM™
> 6.12 lbs. LOST! — PLACEBO
> STUDY #1

28. Each of these statements connect the role of ingredients puretumeric and curcumin on a structure or function in the human body. Accordingly, these constitute structure/function claims. However, these statements are not accompanied by the requisite DSHEA Disclaimer. For these reasons, the statements on this panel violate the principles set out here.

29. Similarly, Iovate's HydroxyCut Pro Clinical contains multiple violative statements. On one panel, Defendant claims that *"HydroxyCut is formulated with a scientifically researched key weight loss ingredient to produce significant weight loss results."* (emphasis added). Iovate supports this statement by noting that *"[s]ubjects taking the key ingredient in HydroxyCut (C. canephora robusta) for 60 days lost an average of 10.95 lbs versus the placebo group, which lost an average of 5.40 lbs."* (emphasis added). Iovate then claims that *"[i]n a separate 8-week study, subjects taking C. canephora robusta lost an average of 3.7 lbs versus the placebo group, which lost 1.25 lbs."* (emphasis added).

30. Iovate next claims that HydroxyCut's key ingredient *"[p]romotes increased energy expenditure to help you burn more calories."* (emphasis added). Iovate supports this statement by noting that *"[i]n short term studies, research shows that caffeine can help temporarily promote increased energy expenditure (calorie burning)."* (emphasis added).

31. Iovate then advertises that *"[n]aturally sourced coffee extract has been included to give you a clean energy boost."* (emphasis added). Iovate notes that the product *"[c]ontains naturally sourced caffeine to help increase energy."* (emphasis added).

32. Finally, Iovate claims that *"Vitamin D has been added to help support general good health and B vitamins to help metabolize carbs, fats and proteins"* and that the product *"[c]ontains B vitamins, which help with the conversion of carbs, protein and fat."* (emphasis added).

33. A photograph of this panel is included on the following page:

///

///

///

///



34. Each of these statements describe the role of an ingredient on the structure or function in the human body. Accordingly, these statements represent structure/function claims. But, significantly, these statements are not supported by the required DSHEA Disclaimer directly on this panel. Therefore, in light of the principles described herein, the statements contained on this panel violate the Dietary Supplement Health and Education Act of 1994.

///

///

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED  10

**Plaintiff's Purchase of the Product**

35.     Plaintiffs purchased several of the offending Iovate Products during the Class Period. Prior to purchasing the Products, Plaintiffs saw, heard and relied upon packaging, labeling, advertisements, representations and statements made by Defendant Iovate, including advertisements and labels set forth above.

36.     As a result of Defendant's representations, sale, and offer for sale, of the Products, Plaintiffs believed that the Products were lawful, correctly branded, subject to a governmental review and approval process, and had therapeutic value, including that they were intended to prevent or treat disease.

37.     Plaintiffs have suffered injury in fact and lost money as a result of Defendant's conduct described herein. Plaintiffs would not have purchased the Products had they known that the Products were unlawful to sell. Plaintiffs otherwise paid more for the Products than had they known the truth about these Products and that they were unlawful to sell.

38.     If Plaintiffs were confident that the marketing and sale of the Products was lawful, truthful, and non-misleading, Plaintiffs may purchase the Products in the future. At present, however, Plaintiffs cannot purchase the Products because Plaintiffs cannot be confident that the Products are lawful and that their labeling is truthful and non-misleading.

39.     On May 19, 2021, Plaintiffs issued a pre-suit demand for corrective action to Defendant, notifying it of its violations of California law. Defendant refused to repair or correct its violations, thus requiring Plaintiff to file this action.

**CLASS ACTION ALLEGATIONS**

40.     Class Definition: Plaintiffs brings this class action on behalf of themselves, and as a class action on behalf of the following putative classes (the "Class"):

**Nationwide Class**

All individual residents of the United States who purchased the Products through the date of class certification. Excluded from the Class are: (1) Defendant and all directors, officers, employees, partners, principals, shareholders and agents of Defendant; (2) Any currently sitting United States District Court Judge or Justice, and the current spouse and all other persons within the third-degree of consanguinity to such judge/justice; and (3) Class Counsel.

**California Sub-Class**

All individual residents of the State of California who purchased the Products through the date of class certification. Excluded from the Class are: (1) Defendant and all directors, officers, employees, partners, principals, shareholders and agents of Defendant; (2) Any currently sitting United States District Court Judge or Justice, and the current spouse and all other persons within the third-degree of consanguinity to such judge/justice; and (3) Class Counsel.

41. Plaintiffs reserves the right to amend the Class definitions if further investigation and discovery indicates that the Class definitions should be narrowed, expanded, or otherwise modified, including through the use of multi-state subclasses to account for material differences in state law, if any.

42. <u>Numerosity and Ascertainability</u>: Plaintiffs do not know the exact number of members of the putative classes. Due to Plaintiffs' initial investigation, however, Plaintiffs are informed and believe that the total number of Class members is at least in the tens of thousands, and that members of the Class are numerous and geographically dispersed throughout the United States and California. While the exact number and identities of the Class members are unknown at this time, such information can be ascertained through appropriate investigation and discovery, including Defendant's records, either manually or through computerized searches.

43. <u>Typicality and Adequacy</u>: Plaintiffs' claims are typical of those of the proposed Class, and Plaintiffs will fairly and adequately represent and protect the interests of the proposed Class. Plaintiffs do not have any interests that are antagonistic to those of the proposed Class. Plaintiffs have retained counsel competent and experienced in the prosecution of this type of litigation.

44. <u>Commonality</u>: The questions of law and fact common to the Class members, some of which are set out below, predominate over any questions affecting only individual Class members:

    a.   whether Defendant committed the conduct alleged herein;

    b.   whether Defendant's conduct constitutes the violations of laws alleged herein;

     c.  whether Defendant's labeling, sale and advertising set herein are unlawful, untrue, or are misleading, or reasonably likely to deceive;

     d.  whether Defendant's conduct violates public policy;

     e.  whether Defendant engaged in unfair or unlawful business practices in marketing and distributing the Products;

     f.  whether the Products are adulterated and/or misbranded under the California Health & Safety Code and identical federal law;

     g.  whether Defendant knowingly concealed or misrepresented material facts for the purpose of inducing consumers into spending money on the Products;

     h.  whether Defendant's representations, concealments and non-disclosures concerning the Products are likely to deceive the consumer;

     i.  whether Defendant's representations, concealments and non-disclosures concerning the Products violate the UCL and/or the common law;

     j.  whether Defendant should be permanently enjoined from making the claims at issue; and

     k.  whether Plaintiff and the Class are entitled to restitution and damages.

45.  <u>Predominance and Superiority</u>: Common questions, some of which are set out above, predominate over any questions affecting only individual Class members. A class action is the superior method for the fair and just adjudication of this controversy. The expense and burden of individual suits makes it impossible and impracticable for members of the proposed Class to prosecute their claims individually and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

46.     Manageability: The trial and litigation of Plaintiffs' and the proposed Class' claims are manageable. Defendant has acted and refused to act on grounds generally applicable to the Class, making appropriate final injunctive relief and declaratory relief with respect to the Class as a whole.

47.     Notice: If necessary, notice of this action may be affected to the proposed Class through publication in a manner authorized in the California Rules of Court, Civil Code, and/or the Federal Rules of Civil Procedure. Also, Class members may be notified of the pendency of this action by mail and/or email, through the distribution records of Defendant, third party retailers, and vendors.

**FIRST CAUSE OF ACTION**
**VIOLATION OF UNFAIR COMPETITION LAW**
**(CAL. BUS. & PROF. CODE § 17200, *et seq.*)**
**(Unlawful and Unfair Prongs of the Act)**

48.     Plaintiffs incorporate by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

49.     Plaintiffs bring this claim individually and on behalf of the proposed California Sub-Class against Defendant.

50.     California Business and Professions Code § 17200 prohibits any "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." For the reasons discussed above, Defendant has engaged in unlawful and unfair acts in violation of California Business & Professions Code §17200.

51.     As alleged herein, Plaintiffs have standing to pursue this claim as Plaintiffs have suffered injury in fact and have lost money or property as a result of Defendants' actions. Specifically, Plaintiffs purchased the Products for their own personal use. In so doing, Plaintiffs relied upon the representations referenced above. Plaintiffs would not have purchased the Products had they known that the Products were unlawful to sell in California and the United States.

52.     **Unlawful Business Practices:** Defendant's actions, as alleged herein, constitute illegal and unlawful practices committed in violation of the Business & Professions Code §17200.

53.     As alleged herein, Defendant has violated provisions of the FDCA, as amended by DSHEA, and implementing regulations, and in turn, the California Health & Safety Code,

1    including, at least, the following sections: 21 C.F.R. § 101.93(b); 21 U.S.C. § 403(r)(6)(C); 21
2    U.S.C. § 343(r)(6); and 21 U.S.C. §§ 331, 333.

3    54.    As alleged herein, Defendant's conduct, including the above violations, violates the provisions of the California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code § 109875 et seq. (the "Sherman Law"), including, but not limited to, the following sections: § 110100; § 110395; § 110398; § 110400.

55.    Plaintiffs and the California Sub-Class reserve the right to allege other violations of law which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

56.    **Unfair Business Practices**: California Business & Professions Code § 17200 also prohibits any "unfair ... business act or practice."

57.    Defendant's conduct alleged herein also constitute "unfair" business acts and practices within the meaning of Business & Professions Code § 17200 *et seq*. in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

58.    There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

59.    Defendant's conduct caused substantial injury to Plaintiff and the other California Sub-Class members. Plaintiffs have suffered injury in fact and have lost money as a result of Defendant's unfair conduct.

60.    Pursuant to section 17203 of the California Business & Professions Code, Plaintiff and the California Sub-Class seek an order of this court enjoining Defendant from continuing to engage in unlawful, unfair, or deceptive business practices and any other act prohibited by law, including, but not limited to: (a) selling, marketing, or advertising the Products with representations set forth above; (b) engaging in any of the unlawful or unfair conduct described herein; and (c) engaging in any other conduct found by the Court to be unlawful or unfair.

61.    In addition, Plaintiffs request that this Court enter such orders or judgments as may

be necessary to restore to any person in interest any money which may have been acquired by means of such illegal practices as provided in Business & Professions Code § 17203, and for such other relief as set forth below.

62. Plaintiffs engaged counsel to prosecute this action and is entitled to recover costs and reasonable attorney's fees according to proof at trial.

## SECOND CAUSE OF ACTION
## UNJUST ENRICHMENT

76. Plaintiffs incorporate by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

77. Plaintiffs bring this claim individually and on behalf of the proposed Class against Defendant.

78. As a result of Defendant's unlawful and misleading labeling, marketing, and sale of the Products, Defendant was enriched at the expense of Plaintiffs.

79. Defendant sold Products to Plaintiffs that were not capable of being sold legally and that were worthless.

80. Plaintiffs paid a premium price for the Products.

81. Thus, it is against equity and good conscience to permit Defendant to retain the ill-gotten benefits received from Plaintiffs and the Nationwide Subclass members given that the Products were not what Defendant purported them to be.

82. It would be unjust and inequitable for Defendant to retain the benefit, warranting restitutionary disgorgement to Plaintiffs and Class members of all monies paid for the Products, and/or all monies paid for which Plaintiffs and the Class members did not receive benefit.

83. As a direct and proximate result of Defendant's actions, Plaintiffs and Class members have suffered damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and as representative of all other persons similarly situated, pray for judgment against Defendant, as follows:

1. An order certifying that the action may be maintained as a Class Action under Fed.

R. Civ. P. 23;

2. An order permanently enjoining Defendant from pursuing the policies, acts, and practices complained of herein;

3. An order requiring Defendant to pay restitution to Plaintiffs and all members of the Class;

4. An order requiring Defendant to pay damages to Plaintiffs and all members of the Class;

5. An order requiring Defendant to pay punitive damages to Plaintiffs and all members of the Class;

6. For pre-judgment interest from the date of filing this suit;

7. For reasonable attorneys' fees;

8. Costs of this suit; and,

9. Such other and further relief as the Court may deem necessary and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demands a jury trial on all issues so triable.

Dated: June 25, 2021                              Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:       */s/ L. Timothy Fisher*
                   Attorney

L. Timothy Fisher (State Bar No. 191626)
Joel D. Smith (State Bar No. 244902)
Sean L. Litteral (State Bar No. 331985)
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com
            jsmtih@bursor.com
            slitteral@bursor.com

*Attorneys for Plaintiff*