**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joel D. Smith (State Bar No. 244902)
Sean L. Litteral (State Bar No. 331985)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: ltfisher@bursor.com
        jsmith@bursor.com
        slitteral@bursor.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC BARNES and KATTY LOPEZ individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> IOVATE HEALTH SCIENCES U.S.A., INC., <br><br> Defendant. | Case No. 5:21-cv-04978-LHK <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> <u>JURY TRIAL DEMANDED</u> |

Plaintiffs Eric Barnes and Katty Lopez (hereafter "Plaintiffs"), individually and on behalf of all other similarly situated purchasers (hereafter the "Class"), bring this consumer class action against Iovate Health Sciences U.S.A., Inc. (hereafter "Defendant") for the distribution, advertisement, and sale of certain products, including (1) HydroxyCut Hardcore, (2) HydroxyCut Hardcore Elite, (3) HydroxyCut Ultra Lean, (4) HydroxyCut Pro Clinical, and all other substantially similar products (collectively the "Products").

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, and Plaintiff, as well as most members of the proposed class, are citizens of states different from Defendant.  This Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

2.      Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because Plaintiffs are citizens of California and reside in this District, and because Plaintiffs purchased the Products in this District. Moreover, Defendant purposefully availed itself of this District through its distribution, advertisement, and sale of the Products, which are the subject of the present complaint, in this District.

## THE PARTIES

3.      Plaintiff Eric Barnes is an individual domiciled in Emeryville, California.  Plaintiff Barnes purchased (1) HydroxyCut Hardcore and (2) HydroxyCut Hardcore Elite at numerous points during the last four years from the Walmart store in Santa Clara for personal use in California, including approximately the Spring of 2020.  In doing so, Plaintiff Barnes relied upon Defendant's advertising, packaging, labeling and other promotional materials, which were jointly prepared and approved by Defendant and its agents and disseminated through advertising media containing the unlawful claims alleged herein.  Specifically, Plaintiff Barnes understood and appreciated that the key ingredients contained in the Products, including HydroxyCut Hardcore's use of green coffee extract and caffeine anhydrous, and HydroxyCut Hardcore Elite's use of C. canephora robusta, would lead to weight loss and enhance his energy levels.  These outcomes were

Plaintiff Barnes' chief reason for purchasing the Products as he specifically set out to find such Products.

4.     The prominent use of the phrases, "Hardcore Weight Loss," "Extreme Energy," and "Maximum Intensity" led Plaintiff to pick up HydroxyCut Hardcore and to turn the bottle for further education.  After reading that green coffee extract and caffeine anhydrous would lead to his desired therapeutic outcomes of losing weight and improving his energy levels, and finding no contradictory information in the areas where these outcomes were disclosed, Plaintiff Barnes added this Product to his shopping cart.  Likewise, Plaintiff Barnes picked up HydroxyCut Hardcore Elite after noticing the prominent use of the phrases "Lose Weight" and "Extreme Energy" on the front of the bottle.  Again, Plaintiff Barnes picked up the bottle for further information.  After reading that C. canephora robusta would lead to his desired therapeutic outcomes of losing weight and enhancing his energy levels, and finding no contradictory information in the area where these outcomes were disclosed, Plaintiff Barnes also added this Product to his shopping cart.

5.     Plaintiff Barnes would not have purchased the Products if he had known the truth about the Products, namely that the ingredients would not lead to his desired therapeutic outcomes of losing weight and improving his energy levels.  Moreover, Plaintiff Barnes would not have purchased the Products if he had known in advance that these claims had not been evaluated by the Food and Drug Administration (the "FDA").  Plaintiff Barnes believes that the prominent use of such a statement would have aided him in his purchase by calling into question the efficacy of the ingredients, allowing him to make an informed choice as a reasonable consumer.  Plaintiff Barnes would not have purchased the Products if he had known that Defendant's statements had not, in fact, been evaluated by the FDA and that they were otherwise unlawful to sell under California law.

6.     Plaintiff Katty Lopez is an individual domiciled in Antioch, California.  Plaintiff Lopez purchased (1) HydroxyCut Ultra Lean and (2) HydroxyCut Pro Clinical at numerous points during the last four years from the Walmart Supercenter store in Antioch for personal use in California, including approximately the winter of 2020.  In doing so, Plaintiff Lopez relied upon Defendant's advertising, packaging, labeling and other promotional materials, which were jointly

prepared and approved by Defendant and its agents and disseminated through advertising media containing the unlawful claims alleged herein. That is, Plaintiff Lopez appreciated that the key ingredients contained in the Products, including HydroxyCut Ultra Lean's use of pure turmeric, curcumin, and alpha lipoic acid, and HydroxyCut Pro's use of C. canephora robusta and naturally sourced caffeine, would lead to weight loss and enhance her energy levels. These outcomes were Plaintiff Lopez's chief reason for purchasing the Products as she specifically set out to find such Products.

7.     The prominent use of the phrase, "Healthy Weight Loss," led Plaintiff to pick up HydroxyCut's Ultra Lean and to turn the bottle for further education. After reading that pure turmeric, curcumin, and alpha lipoic acid would lead to her desired therapeutic outcomes of losing weight and improving her energy levels, and finding no contradictory information in the areas where these outcomes were disclosed, Plaintiff Lopez added this Product to her shopping cart. Likewise, Plaintiff Lopez picked up HydroxyCut Hardcore Elite after noticing the prominent use of the phrases "Extreme Energy" and "Weight Loss" on the front of the bottle. Again, Plaintiff Lopez picked up the bottle for further information. After reading that C. canephora robusta would lead to her desired therapeutic outcomes of losing weight and enhancing her energy levels, and finding no contradictory information in the area where these outcomes were disclosed, Plaintiff Lopez also added this Product to her shopping cart.

8.     Plaintiff Lopez would not have purchased the Products if she had known the truth about the Products, namely that the ingredients would not lead to her desired therapeutic outcomes of losing weight and improving her energy levels. Moreover, Plaintiff Lopez would not have purchased the Products if she had known in advance that these claims had not been evaluated by the Food and Drug Administration (the "FDA"). Plaintiff Lopez believes that the prominent use of such a statement would have aided her in her purchase by calling into question the efficacy of the ingredients, allowing her to make an informed choice as a reasonable consumer. Plaintiff Lopez would not have purchased the Products if she had known that Defendant's statements had not, in fact, been evaluated by the FDA and that they were otherwise unlawful to sell under California law.

9.      Defendant Iovate Health Sciences is a Delaware corporation with its principal place of business in Wilmington, Delaware. At times relevant to this Complaint, Defendant has advertised, marketed, and sold a variety of cosmetic products, including the Products at issue, to consumers throughout the United States and the State of California.  Defendant has sold the Products directly to consumers via the Internet and through third-party retail stores throughout the United States, including in this District.

## FACTUAL ALLEGATIONS

### A.    The Market For Dietary Supplements Is Rapidly Expanding, Necessitating The Use Of Relevant Laws To Protect Consumers From Products Like Those Produced By Defendant

10.     In 2020, the dietary supplements market in the U.S. was estimated at $46 Billion, and the global market for dietary supplements is expected to grow to $298.5 Billion by 2027.[1]

11.     For decades, consumers have prioritized their health and wellness through the use of dietary supplements.  That interest took on even greater resonance when the COVID-19 pandemic struck last year, with millions of American consumers seeking out ways to stay healthy and boost their immunity.

12.     This has happened at the same time as obesity rates in the U.S. have skyrocketed. According to a new study, the COVID-19 pandemic "'changed eating habits, worsened levels of food security, created obstacles to physical activity, and heightened stress.'"[2]  Since the pandemic began, 42% of adults in the U.S. reported gaining an undesired amount of weight, according to a Harris Poll conducted in February 2021.  U.S. adults reported gaining an average of 29 pounds. Those who struggle with obesity—having a body mass index of 30 or higher – are at greater risk for a range of diseases, including heart disease and stroke, two of the leading causes of death in the

---

[1] https://www.businesswire.com/news/home/20210219005385/en/Global-Dietary-Supplements-Market-Report-2020-Market-to-Reach-298.5-Billion-by-2027---U.S.-Market-is-Estimated-at-46-Billion-While-China-is-Forecast-to-Grow-at-12.7-CAGR---ResearchAndMarkets.com.

[2] Kaia Hubbard, "The Pandemic Has Worsened the U.S. Obesity Epidemic," U.S. News & World Reports (Sept. 15, 2021), https://www.usnews.com/news/best-states/articles/2021-09-15/the-pandemic-has-worsened-americas-obesity-epidemic-report-finds (last accessed Oct. 10, 2021) (quoting Trust for America's Health, "State of Obesity 2021: Better Policies for a Healthier America,"  (Sept. 2021), https://www.tfah.org/wp-content/uploads/2021/09/2021ObesityReport_Fnl.pdf).

United States, according to the Centers for Disease Control and Prevention.  Moreover, those who struggle with obesity at greater risk of coronavirus infection, hospitalization and death.[3]

13.     Motivated. in part. by the desire to lose weight, U.S. consumers' purchases of vitamins and supplements  has increased significantly. IRI calculates that vitamin, mineral and supplement sales have risen 21% since the pandemic began, with market shares of certain types of vitamins and supplements increasing exponentially.[4]

14.     Larry Levin, executive vice president of consumer and shopper marketing at IRI states that: "Prior to COVID-19, 80% of consumers were using vitamins, minerals and supplements as part of their ritual anyway, but I think the pandemic just strengthened their commitment to the product category."[5]

15.     IRI data shows that buying vitamins and supplements has been at the forefront of consumers' minds since the early days of the pandemic, with 35% of households buying vitamins in the four weeks ending April 5, 2020.[6]  The momentum has continued, with 40.6 million households purchasing vitamins in January 2021, compared to 35.5 million the prior year. According to Mr. Levin, "When you think about the impact that category has on our lifestyle, it's really profound."[7]

16.     The COVID-19 pandemic has demonstrated more than ever that consumers will seek to support their health through dietary supplements and, in making those critical purchasing decisions, must be able to trust that labels and claims for dietary supplements are truthful, substantiated, and meet all legal requirements to be lawfully sold over the counter.  However, according to FDA spokesperson, Courtney Rhodes, "[t]he FDA currently has no systematic way of knowing what dietary supplements are on the market, when new products are introduced, or what

---

[3] *Id.*
[4] Crowe, Emily, "Behind the growth in the dietary supplement, vitamin market," Smart Brief (Mar. 3, 2021), https://www.smartbrief.com/original/2021/03/behind-growth-dietary-supplement-vitamin-market (last visited Oct. 10, 2021).
[5] *Id.*
[6] *Id.*
[7] *Id.*

they contain."[8]  This problem is exacerbated by the fact that when the relevant laws were passed, "the supplement market was worthy about $5 billion.  Now it's roughly $50 billion."  That is, the market grew ten-fold, but "the FDA budget did not increase by 10 times."  As a result, supplement companies like Defendant are able to use this vacuum in enforcement to their advantage, marketing their products as diagnosing, treating, or curing diseases without any evidence regarding their efficacy and without prior approval by the FDA, thus violating federal statutes and regulations and Article III Courts jurisprudence in this area.

17.     In turn, consumers, like Plaintiffs, who sought out weight loss products were led to believe that Defendant's Products had qualities that they did not have.  Worse, Defendant advertises that its primary ingredient, green coffee bean extract, leads to weight loss despite the fact that the National Institute of Health, Office of Dietary Supplements has determined that such ingredients may only have a "possible modest effect on body weight" and that there have been "few clinical trials, all of poor methodological quality."[9]  Moreover, the United States General Accounting Office (the "GAO") has determined that "[i]n summary, little is known about whether weight loss supplements are effective."[10]  That is, "[a]lthough there have been studies on specific ingredients, many of these studies have been short of duration, involved small numbers of individuals, or used study approaches that limited the usefulness of their findings."  And while some studies may support claims in the short-term, "[t]here have been few comprehensive reviews or long-terms studies of efficacy.  One comprehensive review of alternative treatments for weight loss found no reliable scientific evidence for the efficacy of any of the weight loss supplements that it reviewed."[11]

///

---

[8] Christie Aschwanden, "Prohibited, unlisted, even dangerous ingredients turn up in dietary supplements," *The Washington Post* (June 30, 2021), https://www.washingtonpost.com/health/contaminated-supplements-unexpected-ingredients/2021/06/25/5d2227ec-bd62-11eb-83e3-0ca705a96ba4_story.html (last visited Oct. 10, 2021).
[9] National Institute of Health, Office of Dietary Supplements, "Dietary Supplements for Weight Loss: Feet Sheet for Health Professionals."
[10] Janet Heinrich, "Dietary Supplements For Weight Loss," United States General Accounting Office (July 21, 2002), https://www.gao.gov/assets/gao-02-985t.pdf (last visited Oct. 11, 2021).
[11] *Id.* at 6.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

B.     **The Labeling Requirements For Dietary Supplements**

1.     **An Overview Of The Statutory And Regulatory Scheme And Associated Jurisprudence**

18.     The Federal Food, Drug, and Cosmetic Act of 1938, 21 U.S.C. § 301 *et seq*. (the "FFDCA" or the "Act"), as amended by the Dietary Supplement Health and Education Act of 1994, Pub. L. No. 103–417, 108 Stat. 4325 ("DSHEA"), as well as the regulations implementing the FFDCA and DSHEA set forth the legal requirements for labelling and selling dietary supplements.

19.     These requirements are fully incorporated into California's Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code § 109875 *et seq*. ("Sherman Law").  The Sherman Law is explicitly authorized by the FFDCA, 21 U.S.C. § 343-1.  The Sherman Law imposed identical requirements to the FFDCA, including the FFDCA's food labeling requirements.  *See* Cal. Health & Safety Code § 110100.

20.     In 1906 Congress enacted the FFDCA's predecessor, the Pure Food and Drugs Act of 1906.  *See 62 Cases More of Less, Each Containing Six Jars of Jam v. United States*, 340 U.S. 593, 594, 71 S. Ct. 515, 517, 95 L. Ed. 566 (1951) (outlining the history of the FFDCA).  "By the Act of 1906, 34 Stat. 768, as successively strengthened [by the FFDCA], Congress exerted its power to keep impure and adulterated foods and drugs out of the channels of commerce."  *Id.* at 596.  "The purposes of this legislation, we have said, 'touch phases of the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection. Regard for these purposes should infuse construction of the legislation if it is to be treated as a working instrument of government and not merely as a collection of English words.'"  *Id.* (quoting *United States v. Dotterweich*, 320 U.S. 277, 280, 64 S. Ct. 134, 136, 88 L.Ed. 48.).  Specifically, "[m]isbranding was one of the chief evils Congress sought to stop."  *Id.*   That is, "[t]he purpose of the act [was] to secure the purity of food and drugs, and to inform purchasers of what they are buying.  Its provisions are directed to that purpose and must be construed to effect it."  *United States v. Antikamnia Chem. Co.*, 231 U.S. 654, 665, 34 S. Ct. 222, 225, 58 L.Ed. 419 (1914).

21.     For well over 100 years since the Pure Food and Drugs Act was initially enacted,

both Congress and Article III Courts have demonstrated concern with the information conveyed on the packaging of foods and drugs whether or not they are harmful to health. *See United States v. Bodine Produce Co.*, 206 F. Supp. 201, 208 (D. Ariz. 1962) (citing *A.O. Andersen & Co v. United States*, 9 Cir., 1922, 284 F.542, 544; *United States v. Lexington Mill & Elevator Co.*, 1914, 232 U.S. 299, 410, 34 S.Ct. 337, 58 L.Ed. 658*; United States v. 716 Cases etc. Del Comida Brand Tomatoes*, 10 Cir., 1950 179 F.2d 175, 176; *United States v. 449 Cases etc. Tomato Paste*, 2 Cir., 1954, 212 F.2d 567, 570-572; and *United States v. Lazere, D.C.N.D. Iowa* 1944, 56 F.Supp. 730, 732) ("In a long line of cases, the courts have held foods [and drugs] may be adulterated regardless of whether they are injurious to health.").

22.     To this end, "the FFDCA must be 'given a liberal construction consistent with the Act's overriding purpose to protect the public health.'" *League of United Latin Am. Citizens v. Regan*, 996 F.3d 673, 691 (9th Cir. 2021) (citing *United States v. An Article of Drug . . . Bacto-Unidisk*, 394 U.S. 784, 798, 89 S.Ct. 1410, 22 L.Ed.2d 726 (1969)).

23.     Under the FFDCA, a "drug" is defined, in part, as an "article[] intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals" or an "article[] (other than food) intended to affect the structure or any function of the body of man or other animals." 21 U.S.C. § 321(g)(1).

24.     Under 21 U.S.C. §§ 331(d)[12] and 355(a)[13], the FDA must approve new drugs before they can be sold on the market. Only then can a manufacturer make any claims that their product can treat, prevent or cure a disease. These claims are reserved for pharmaceutical products that have undergone years of extensive clinic, laboratory and safety studies. These studies are costly and can take decades to complete.[14] In light of these delays, the FFDCA creates an exemption from this pre-approval process for dietary supplements "intended to affect the structure or function

---

[12] 21 U.S.C. § 331(d) ("The following acts and the causing thereof are prohibited: . . . The introduction or delivery for introduction into interstate commerce of any article in violation of section . . . 355 . . . of this title.").

[13] 21 U.S.C. § 355(a) ("No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval or application [is] filed[.]").

[14] Jamie Underwood, "These Statement Have Not Been Evaluated by the Food and Drug Administration, *Edible Chemistry Consulting* (Jun 7, 2019), https://edible-chemistry.com/news-notes/2019/6/7/these-statements-have-not-been-evaluated-by-the-food-and-drug-administration (last accessed Oct. 11, 2021).

of the body" if the dietary supplements carry a prominent FDA disclaimer on the product labels and advertising.

25.     Under these regulations, supplement companies like Defendant are prohibited from labeling, marketing, or selling dietary supplements bearing claims that "describe[] the role of a nutrient or dietary ingredient intended to affect the structure or function in humans, [or that] characterize[] the documented mechanism by which a nutrient or dietary ingredient acts to maintain such structure or function" (known as "structure/function claims"), unless the label carries a prominent disclaimer (the "DSHEA Disclaimer") on each panel bearing such claims.  *See* 21 U.S.C. §§ 321(g)(1), 331(d), 343(f),[15] 343(r)(1)(B), 343(r)(6), 355(a); 21 C.F.R. § 101.93(d) ("On product labels and in labeling (e.g., pamphlets, catalogs), the disclaimer shall appear on each panel or page where there [is a structure/function claim].").

26.     The DSHEA Disclaimer must be prominent and bolded, and it must read:

> **These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure, or prevent any disease.**

21 U.S.C. § 343(r)(6)(C); *see also* 21 C.F.R. § 101.93(b)-(e).

27.     To be prominent, the disclaimer may not be crowded with non-required, or voluntary, information or imagery and additionally must be bolded font *at least* 1/16th of an inch in size.

28.     As one Court recently explained, the DSHEA Disclaimer requirement is important for consumer safety:

> The disclaimer requirement aligns with the FDA's recognition that few dietary supplements have been the subjects of adequately designed clinical trials. Without the disclaimer, structure/function claims convey therapeutic drug claims, thereby encouraging self-treatment without the benefit of a medical diagnosis or treatment. The point of the disclaimers are to make sure that consumers understand that structure/function claims are not reviewed by [the] FDA prior to marketing, and to caution consumers that dietary supplements bearing such claims *are not for therapeutic uses*.

---

[15] 21 U.S.C. § 343(f) ("If any word, statement, or other information required by or under authority of this chapter to appear on the label or labeling is not prominently placed thereon with such conspicuousness (as compared with other words, statements, designs, or devices, in the labeling) and in such terms as to render it likely to be read and understood by the ordinary individual under customer conditions of purchase and use.").

*Arora v. GNC Holdings, Inc.*, No. 19-cv-02414-LB, 2019 WL 6050750, at *3 (N.D. Cal. Nov. 15, 2019) (internal quotation marks and citations omitted) (emphasis in original).

29.     Dietary supplements that do not bear the required DSHEA Disclaimer on **all** panels with structure/function claims, and/or the disclaimer lacks the prominence required, are misbranded and unlawful.  21 U.S.C. § 343(r)(1)(B), (r)(6); 21 C.F.R. § 101.93(d).  The Food and Drug Administration has specifically rejected the proposition "that repetition of the disclaimer on every panel or page where a statement [is] made…is unnecessary."  62 Fed. Reg. 49859, 49864. To meet statutory requirements, "**the disclaimer must be within the same field of vision as the statement itself**."  *Id.* at 49865 (emphasis added).

30.     Moreover, such products qualify as "drugs" under the FFDCA because they are marketed with structure/function claims but do not include the DSHEA Disclaimer. *See* 21 U.S.C. §§321(g)(1), 343(r)(6).  To avoid being regulated as drugs under the FFDCA, dietary supplements bearing structure/function claims must comply with the DSHEA Disclaimer requirements. *Id.*

31.     Misbranded dietary supplements and/or unapproved drugs are unlawful and cannot be sold legally under federal and identical California law.  21 U.S.C. §§ 331, 333.

**C.**     <u>**Defendant's Unlawful Advertising, Sale and Labeling Of The Products**</u>

32.     Unfortunately for consumers, Defendant Iovate continues to advertise, sell, and label its products in violation of the statutes referred to herein.

33.     At numerous points during the Class Period, Plaintiff Barnes purchased Defendant Iovate's HydroxyCut Hardcore and Hardcore Elite.  As the photographs below demonstrate, Iovate's products do not comply with the laws and regulations set out herein.

34.     The packaging of the products described here has not changed in any material respect over the last four years.  *See* Dkt Nos. 16-1, 16-7.

35.     Photographs of the relevant panel and structure / functions claims made as a part of the packaging for HydroxyCut Hardcore is set out below.  HydroxyCut Hardcore's left-facing panel contains numerous structure or function claims.  Iovate claims that "[w]hen you're looking for hardcore results, reach for the power of HydroxyCut Hardcore.  *Formulated with a scientifically researched key weight loss complex (green coffee extract)*.  HydroxyCut Hardcore

has been designed to deliver the significant weight loss results you've been looking for." (emphasis added).  Iovate also claims that green coffee extract is a "***Key Weight Loss Ingredient Tested in 2 Scientific Studies***." (emphasis added).  In support of this statement, Iovate states that "[i]n one study, ***subjects taking the primary ingredient (green coffee extract) . . . for 60 days lost, on average, 10.98 lbs versus the placebo group***."  (emphasis added).  Iovate then notes that "[i]n a separate 8-week study, ***subjects using the same key ingredient lost an average of 3.7 lbs versus the subjects using a placebo***."  (emphasis added).  But Iovate does not stop there.  Instead, Iovate goes onto claim that "HydroxyCut Hardcore ***contains another powerful ingredient (caffeine anhydrous) that's been shown to deliver a serious boost of energy***.  After your very first dose you'll experience extreme energy for maximum intensity."  (emphasis added); *see also* Dkt. No. 16-2.

36.     The above-quoted statements have the capacity, likelihood, or tendency to confuse the public because taking green coffee extract does not help people lose weight.

37.     In addition, each of these statements explicitly describe the role of the green coffee extract and caffeine anhydrous ingredients and their role, namely weight loss and energy development, experienced by humans consuming these ingredients.  Accordingly, these statements represent structure/function claims.  However, as the photographs set out below demonstrate, these statements are not accompanied by the requisite DSHEA Disclaimer.

///
///
///
///
///
///
///
///
///
///



38.     To be sure, the packaging of HydroxyCut Hardcore contains a small DSHEA disclosure on another side of the packaging, but it is not compliant with the law and is misleading. As can be seen from the image above, the disclaimer is not on the same side of the packaging as the statements at issue, and is not "within the same field of vision" as the statements.  62 Fed. Reg. 49859, 49865.

39.     The disclaimer also is not "prominent" because it appears crowded among other nutrition labeling.  *See* Dkt. No. 16-2, page 4 (depicting DSHEA disclaimer on HydroxyCut Hardcore packaging).  The FDA has warned that burying a disclaimer "under the nutrition label" does "not provide an acceptable alternative."  62 Fed. Reg. 49859, 49865.  Moreover, the entire

packaging is peppered throughout with numerous different asterisks and symbols, which makes linking one asterisk with any disclosure a confusing process akin to playing a game of hide-and-seek.

40.     Likewise, the left-facing panel of Iovate's HydroxyCut Hardcore Elite contains multiple controverted statements.  Iovate encourages consumers to "[f]uel your most intense workouts and tackle your jam-packed days **with a scientifically researched dose of caffeine anhydrous that boosts energy and mental focus**." (emphasis added).  Iovate doubles down by noting that " **[i]n one study, researchers monitored subjects who took C. canephora robusta – the key weight loss ingredient in HydroxyCut Hardcore Elite – for 60 days**.  On average, they lost 10.95 lbs, while the placebo group lost an average of 5.4 lbs." (emphasis added).  Iovate then advertises that "[i]n a separate 8-week study, researchers monitored two groups following a calorie-reduced diet and performing moderate exercise. **Subjects using C. canephora robusta lost an average of 3.7lbs, while those using a placebo lost an average of 1.25 lbs.**"

41.     The above-quoted statements have the capacity, likelihood, or tendency to confuse the public because taking caffeine anhydrous or c caephora robusta, whether alone or in combination, does not help people lose weight.

42.     Again, Defendant fails to reveal to consumers the true efficacy of the ingredients and its statements specifically describe the role of "key" ingredients, caffeine anhydrous and C. candephora robusta, to their role, namely weight loss and energy development, experienced by humans consuming these ingredients.  Accordingly, these statements represent structure/function claims.  However, as the photograph set out below demonstrates, these statements are not accompanied by the requisite DSHEA Disclaimer.

///

///

///

///

///

///



43.     Here again, the packaging contains a DSHEA disclaimer, but as shown in the image above, it is nowhere to be found on the same side of the packaging that contains the misleading statements.  The disclaimer on Hydroxycut Hardcore Elite is non-complaint and misleading for the same reasons described above with respect to Hydroxycut Hardcore.

44.     Iovate's failure to comply with the regulations set out above also affected Plaintiff Lopez's purchase of HydroxyCut Ultra Lean and HydroxyCut Pro Clinical.  On one panel of HydroxyCut Ultra Lean, Defendant Iovate claims that ***"[t]he HydroxyCut research and development team have developed this unique synergistic ingredient combination for weight***

*loss."*  (emphasis added).   Iovate claims that *"CurcumaSlim™ is a combination of two ingredients: pure turmeric / curcumin that provides 95% curcuminoids and alpha lipoic avid (ALA), a compound found naturally in the body that helps turn glucose into energy."* (emphasis added).  Iovate goes on to claim that *"[t]wo scientific studies support the weight loss results from CurcumaSlim™."* (emphasis added).  Specifically, Iovate writes that *"[i]n two 16-week studies, subjects using the key ingredient combination (alpha lipoic acid and curcumin) lost an average of 12.56lbs v. 6.12 lbs for placebo and 4.84 lbs v. 0.87 lbs for placebo, respectively."* (emphasis added).  A photograph of the panel bearing these statements are set out here:



45.     The above-quoted statements have the capacity, likelihood, or tendency to confuse the public because taking tumeric, curcumin, or alpha lipoic acid—whether alone or in any combination—does not help people lose weight.

46.     Each of these statements connect the role of ingredients pure tumeric and curcumin

1   on a structure or function in the human body.  Accordingly, these constitute structure/function

2   claims.  However, these statements are not accompanied by the requisite DSHEA Disclaimer.  For

3   these reasons, the statements on this panel violate the principles set out here.

4        47.    Here again, Defendant claims that the DSHEA disclaimer is provided on another

5   label.  But the Court need only look at Exhibit 3 to Defendant's previously-filed Request for

6   Judicial Notice (Dkt. No. 16-10) to see that the disclaimer is anything but prominent, and on a

7   completely different side of the packaging where the structure/function claims are made.

8        48.    Similarly, Iovate's HydroxyCut Pro Clinical contains multiple violative statements.

9   On one panel, Defendant claims that ***"HydroxyCut is formulated with a scientifically researched***

10  ***key weight loss ingredient to produce significant weight loss results."***  (emphasis added).  Iovate

11  supports this statement by noting that ***"[s]ubjects taking the key ingredient in HydroxyCut (C.***

12  ***canephora robusta) for 60 days lost an average of 10.95 lbs versus the placebo group, which lost***

13  ***an average of 5.40 lbs."***  (emphasis added).  Iovate then claims that ***"[i]n a separate 8-week study,***

14  ***subjects taking C. canephora robusta lost an average of 3.7 lbs versus the placebo group, which***

15  ***lost 1.25 lbs."***  (emphasis added).

16       49.    Iovate next claims that HydroxyCut's key ingredient ***"[p]romotes increased energy***

17  ***expenditure to help you burn more calories."***  (emphasis added).  Iovate supports this statement

18  by noting that ***"[i]n short term studies, research shows that caffeine can help temporarily***

19  ***promote increased energy expenditure (calorie burning)."***  (emphasis added).

20       50.    Iovate then advertises that ***"[n]aturally sourced coffee extract has been included to***

21  ***give you a clean energy boost."***  (emphasis added).  Iovate notes that the product ***"[c]ontains***

22  ***naturally sourced caffeine to help increase energy."*** (emphasis added).

23       51.    Finally, Iovate claims that ***"Vitamin D has been added to help support general***

24  ***good health and B vitamins to help metabolize carbs, fats and proteins"*** and that the product

25  ***"[c]ontains B vitamins, which help with the conversion of carbs, protein and fat."***  (emphasis

26  added).

27       52.    A photograph of this panel is included on the following page:

28



53.    The above-quoted statements have the capacity, likelihood, or tendency to confuse the public because none of the ingredients referenced—whether taken alone or in any combination—help people lose weight.

54.    Defendant fails to inform consumers as to the true efficacy of these ingredients. Moreover, each of these statements describe the role of an ingredient on the structure or function in the human body.   Accordingly, these statements represent structure/function claims.   But, significantly, these statements are not supported by the required DSHEA Disclaimer directly on

1    this panel.  Therefore, in light of the principles described herein, the statements contained on this

2    panel violate the Dietary Supplement Health and Education Act of 1994.

3        55.    Here again, Defendant claims that the DSHEA disclaimer is provided on another

4    label.  But the Court need only look at Exhibit 4 to Defendant's previously-filed Request for

5    Judicial Notice (Dkt. No. 16-11) to see that the disclaimer is anything but prominent, and on a

6    completely different side of the packaging where the structure/function claims are made.

7        **Economic Injury**

8        56.    When purchasing the above-described products, Plaintiffs read and relied on

9    Defendant' labeling and marketing claims.  Like all reasonable consumers and members of the

10   class, Plaintiffs considered a label's compliance with federal law a material factor in their

11   purchasing decisions.  Plaintiffs are generally aware that the federal government carefully regulates

12   packaged food products and dietary supplements and therefore has come to trust that information

13   conveyed on these type of product labels is truthful, accurate, complete, and fully in accordance

14   and compliance with the law.  As a result, Plaintiffs trust that they can compare competing

15   products on the basis of their labeling claims, to make a purchasing decision.

16       57.    Based on the products' labeling, Plaintiffs believed the products had the

17   aforementioned characteristics and benefits, including that they were lawful.

18       58.    As a result, Plaintiffs received products that lacked the characteristics and/or

19   benefits that they reasonably believed the products had.

20       59.    Plaintiffs would not have purchased the above-described products absent these

21   sales, misrepresentations, and labeling and marketing practices.

22       60.    Plaintiffs lost money as a result of Defendants' unlawful and deceptive and

23   misleading conduct because Plaintiffs did not receive the products for which they believed they

24   paid.

25       61.    Plaintiffs altered their position to their detriment and are owed restitution in an

26   amount equal to the amounts they paid for the products they purchased.

27       62.    Plaintiffs would purchase the products at issue again in the future should they have

28   the characteristics and/or the benefits marketed and labeled.

63.     By engaging in unlawful sales and/or deceptive and misleading marketing, Defendant reaped, and continues to reap, increased sales and profits, including with respect to its competitors.

64.     Defendant knows that the qualities and characteristics it labels and markets, as well as its omissions, are material to a consumer's decision to purchase its products.

65.     Defendant deliberately cultivates these misperceptions through its marketing and labeling of its products Indeed, Defendant relies and capitalizes on consumer misconceptions about its products.

**Other Allegations**

66.     If Plaintiffs were confident that the marketing and sale of the Products was lawful, truthful, and non-misleading, Plaintiffs may purchase the Products in the future. At present, however, Plaintiffs cannot purchase the Products because Plaintiffs cannot be confident that the Products are lawful and that their labeling is truthful and non-misleading.  If the Products were lawful and their labeling was truthful and non-misleading, the Products would have value and not be worthless.

67.     On May 19, 2021, Plaintiffs issued a pre-suit demand for corrective action to Defendant, notifying it of its violations of California law.  Defendant refused to repair or correct its violations, thus requiring Plaintiff to file this action.

## CLASS ACTION ALLEGATIONS

68.     Class Definition: Plaintiffs brings this class action on behalf of themselves, and as a class action on behalf of the following putative classes (the "Class"):

**Nationwide Class**

All individual residents of the United States who purchased the Products through the date of class certification.  Excluded from the Class are: (1) Defendant and all directors, officers, employees, partners, principals, shareholders and agents of Defendant; (2) Any currently sitting United States District Court Judge or Justice, and the current spouse and all other persons within the third-degree of consanguinity to such judge/justice; and (3) Class Counsel.

**California Sub-Class**

All individual residents of the State of California who purchased the Products through the

date of class certification.  Excluded from the Class are: (1) Defendant and all directors, officers, employees, partners, principals, shareholders and agents of Defendant; (2) Any currently sitting United States District Court Judge or Justice, and the current spouse and all other persons within the third-degree of consanguinity to such judge/justice; and (3) Class Counsel.

69.    Plaintiffs reserves the right to amend the Class definitions if further investigation and discovery indicates that the Class definitions should be narrowed, expanded, or otherwise modified, including through the use of multi-state subclasses to account for material differences in state law, if any.

70.    Numerosity and Ascertainability: Plaintiffs do not know the exact number of members of the putative classes.  Due to Plaintiffs' initial investigation, however, Plaintiffs are informed and believe that the total number of Class members is at least in the tens of thousands, and that members of the Class are numerous and geographically dispersed throughout the United States and California.  While the exact number and identities of the Class members are unknown at this time, such information can be ascertained through appropriate investigation and discovery, including Defendant's records, either manually or through computerized searches.

71.    Typicality and Adequacy: Plaintiffs' claims are typical of those of the proposed Class, and Plaintiffs will fairly and adequately represent and protect the interests of the proposed Class.  Plaintiffs do not have any interests that are antagonistic to those of the proposed Class. Plaintiffs have retained counsel competent and experienced in the prosecution of this type of litigation.

72.    Commonality: The questions of law and fact common to the Class members, some of which are set out below, predominate over any questions affecting only individual Class members:

     a.    whether Defendant committed the conduct alleged herein;

     b.    whether Defendant's conduct constitutes the violations of laws alleged herein;

     c.    whether Defendant's labeling, sale and advertising set herein are unlawful, untrue, or are misleading, or reasonably likely to deceive;

     d.    whether Defendant's conduct violates public policy;

e.   whether Defendant engaged in unfair or unlawful business practices in marketing and distributing the Products;

f.   whether the Products are adulterated and/or misbranded under the California Health & Safety Code and identical federal law;

g.   whether Defendant knowingly concealed or misrepresented material facts for the purpose of inducing consumers into spending money on the Products;

h.   whether Defendant's representations, concealments and non-disclosures concerning the Products are likely to deceive the consumer;

i.   whether Defendant's representations, concealments and non-disclosures concerning the Products violate the UCL and/or the common law;

j.   whether Defendant should be permanently enjoined from making the claims at issue; and

k.   whether Plaintiff and the Class are entitled to restitution and damages.

73.   <u>Predominance and Superiority</u>: Common questions, some of which are set out above, predominate over any questions affecting only individual Class members.  A class action is the superior method for the fair and just adjudication of this controversy.  The expense and burden of individual suits makes it impossible and impracticable for members of the proposed Class to prosecute their claims individually and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

74.   <u>Manageability</u>: The trial and litigation of Plaintiffs' and the proposed Class' claims are manageable.  Defendant has acted and refused to act on grounds generally applicable to the Class, making appropriate final injunctive relief and declaratory relief with respect to the Class as a whole.

75.     <u>Notice</u>: If necessary, notice of this action may be affected to the proposed Class through publication in a manner authorized in the California Rules of Court, Civil Code, and/or the Federal Rules of Civil Procedure.  Also, Class members may be notified of the pendency of this action by mail and/or email, through the distribution records of Defendant, third party retailers, and vendors.

**FIRST CAUSE OF ACTION**
**VIOLATION OF UNFAIR COMPETITION LAW**
**(CAL. BUS. & PROF. CODE § 17200,** *et seq.***)**
**(Unlawful and Unfair Prongs of the Act)**

76.     Plaintiffs incorporate by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

77.     Plaintiffs bring this claim individually and on behalf of the proposed California Sub-Class against Defendant.

78.     California Business and Professions Code § 17200 prohibits any "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." For the reasons discussed above, Defendant has engaged in unlawful and unfair acts in violation of California Business & Professions Code §17200.

79.     As alleged herein, Plaintiffs have standing to pursue this claim as Plaintiffs have suffered injury in fact and have lost money or property as a result of Defendants' actions. Specifically, Plaintiffs purchased the Products for their own personal use.  In so doing, Plaintiffs relied upon the representations referenced above. Plaintiffs would not have purchased the Products had they known that the Products were unlawful to sell in California and the United States.

80.     **Unlawful Business Practices:** Defendant's actions, as alleged herein, constitute illegal and unlawful practices committed in violation of the Business & Professions Code §17200.

81.     As alleged herein, Defendant has violated provisions of the FDCA, as amended by DSHEA, and implementing regulations, and in turn, the California Health & Safety Code, including, at least, the following sections: 21 C.F.R. § 101.93(b); 21 U.S.C. § 403(r)(6)(C); 21 U.S.C. § 343(r)(6); 21 U.S.C. § 343(f); and 21 U.S.C. §§ 331, 333.

82.     As alleged herein, Defendant's conduct, including the above violations, violates the provisions of the California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code §

109875 et seq. (the "Sherman Law"), including, but not limited to, the following sections: §
110100; § 110395; § 110398; § 110400.

83.     Plaintiffs and the California Sub-Class reserve the right to allege other violations of
law which constitute other unlawful business acts or practices. Such conduct is ongoing and
continues to this date.

84.     **Unfair Business Practices**: California Business & Professions Code § 17200 also
prohibits any "unfair ... business act or practice."

85.     Defendant's conduct alleged herein also constitute "unfair" business acts and
practices within the meaning of Business & Professions Code § 17200 *et seq.* in that its conduct is
substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive,
and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such
conduct.

86.     There were reasonably available alternatives to further Defendant's legitimate
business interests, other than the conduct described herein.

87.     **Fraudulent Business Practices:**   California Business & Professions Code 17200
also prohibits any "fraudulent business act or practice."

88.     Defendant's claims, nondisclosures, and misleading statements with respect to the
Products, as more fully set forth above, were false, misleading, and/or likely to deceive the
consuming public within the meaning of Business & Professions Code § 17200.

89.     Defendant's conduct caused substantial injury to Plaintiffs and the other Class
members.  Plaintiff has suffered injury in fact and has lost money as a result of Defendant's unfair
conduct.

90.     Pursuant to section 17203 of the California Business & Professions Code, Plaintiffs
and the Class seek an order of this Court enjoining Defendant from continuing to engage in
unlawful, unfair, or deceptive business practices and any other act prohibited by law, including, but
not limit to: (a) selling, marketing, or advertising the Products with representations set forth above;
(b) engaging in any of the illegal, fraudulent, misleading, unlawful, unfair and/or deceptive conduct
described herein; and (c) engaging in any other conduct found by the Court to be illegal,

fraudulent, misleading, unlawful, unfair, and/or deceptive conduct.  In addition, Plaintiffs request that this Court enter such orders or judgments as may be necessary to restore to any person in interest any money which may have been acquired by means of such illegal practices as provided in Business & Professions Code § 17203, and for such other relief as set forth below.

91.     Plaintiffs engaged counsel to prosecute this action and is entitled to recover costs and reasonable attorney's fees according to proof at trial.

**SECOND CAUSE OF ACTION**
**VIOLATION OF FALSE ADVERTISING LAW**
**(CAL. BUS. & PROF. CODE 17500, *ET SEQ*.)**

92.     Plaintiffs incorporate by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

93.     Plaintiffs have standing to pursue this claim as Plaintiffs have suffered injury as a result of Defendant's actions as set forth herein.  Specifically, prior to the filing of this action, Plaintiffs purchased in reliance upon Defendant's marketing claims.  Plaintiffs used the Products as directed, but the Products did not work as advertised, nor provide any of the promised benefits.

94.     Defendant's business practices as alleged herein constitute unfair, deceptive, untrue, and misleading advertising pursuant to California Business and Professions Code section 17500, et seq. because Defendant has advertised their Products in a manner that is untrue and misleading, or that Defendant knew was untrue or misleading, or omitted material information from their advertising which Defendant had a duty to disclose.

95.     Defendant's wrongful business practices have caused injury to Plaintiffs and the Class, in the form of the lost purchase price of the Products.  Plaintiffs and the Class purchased the Products after being exposed to Defendant's false or deceptive advertising claims, as described herein.

96.     Defendant's conduct caused and continues to cause substantial injury to Plaintiffs and other members of the Class.  Plaintiffs and the Class continue to be exposed to Defendant's false and/or misleading advertising every time they shop for dietary supplements and encounter Defendant's false or deceptive advertising on store shelves.  Defendant's competitors will also continue to suffer from Defendant's unfair or deceptive business conduct if injunctive relief is not

afforded.

97.     Pursuant to section 17535 of the California Business and Professions Code, Plaintiff and the Class seek an order of this Court enjoining Defendant from continuing to engage in deceptive business practices, false advertising, and any other act prohibited by law, including those set forth in the Complaint.

98.     Plaintiff and the Class also seek an order for the disgorgement and restitution of all monies from the sale of Defendant's Products, which were unjustly acquired through acts of unlawful, unfair, and /or fraudulent competition.

**THIRD CAUSE OF ACTION**
**UNJUST ENRICHMENT**

99.     Plaintiffs incorporate by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

100.     Plaintiffs bring this claim individually and on behalf of the proposed Class against Defendant.

101.     As a result of Defendant's unlawful and misleading labeling, marketing, and sale of the Products, Defendant was enriched at the expense of Plaintiffs.

102.     Defendant sold Products to Plaintiffs that were not capable of being sold legally and that were worthless.

103.     Plaintiffs paid a premium price for the Products.

104.     Thus, it is against equity and good conscience to permit Defendant to retain the ill-gotten benefits received from Plaintiffs and the Nationwide Subclass members given that the Products were not what Defendant purported them to be.

105.     It would be unjust and inequitable for Defendant to retain the benefit, warranting restitutionary disgorgement to Plaintiffs and Class members of all monies paid for the Products, and/or all monies paid for which Plaintiffs and the Class members did not receive benefit.

106.     As a direct and proximate result of Defendant's actions, Plaintiffs and Class members have suffered damages in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and as representative of all other persons similarly situated, pray for judgment against Defendant, as follows:

1.     An order certifying that the action may be maintained as a Class Action under Fed. R. Civ. P. 23;

2.     An order permanently enjoining Defendant from pursuing the policies, acts, and practices complained of herein;

3.     An order requiring Defendant to pay restitution to Plaintiffs and all members of the Class;

4.     An order requiring Defendant to pay damages to Plaintiffs and all members of the Class;

5.     For pre-judgment interest from the date of filing this suit;

6.     For reasonable attorneys' fees;

7.     Costs of this suit; and,

8.     Such other and further relief as the Court may deem necessary and appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial on all issues so triable.

Dated:  October 13, 2021                    Respectfully submitted,

                                            **BURSOR & FISHER, P.A.**

                                            By:_____/s/ L. Timothy Fisher_____

                                            L. Timothy Fisher (State Bar No. 191626)
                                            Joel D. Smith (State Bar No. 244902)
                                            Sean L. Litteral (State Bar No. 331985)
                                            1990 North California Boulevard, Suite 940
                                            Walnut Creek, CA  94596
                                            Telephone: (925) 300-4455
                                            Facsimile:  (925) 407-2700
                                            E-Mail: ltfisher@bursor.com
                                                    jsmith@bursor.com
                                                    slitteral@bursor.com

                                            *Attorneys for Plaintiffs*